The Honorable James L. Robart

1

2

3

4

5

6

7    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON
8    AT SEATTLE

9    FULLTIME FANTASY SPORTS, LLC a
     Delaware limited liability company,
10
                                   Plaintiff,
11
           v.
12   STEVEN and JANE DOE RINDNER, and their
     marital community; MARK and JANE DOE
13   STEIGLITZ, and their marital community;
     DOUG and JANE DOE SMITH, and their marital
14   community; CRAIG and JANE DOE MALITZ,
     and their marital community; ROSS and JANE
15   DOE LEVINSOHN, and their marital community;
     ROSS and JANE DOE LUKATSEVITCH, and
16   their marital community; JOE and JANE DOE
     ROBINSON, and their marital community;
17   TAMMER and JANE DOE FAHMY, and their
     marital community; MAYO and JANE DOE
18   STUNTZ, and their marital community; JAMES
     and JANE DOE HECKMAN, and their marital
19   community, PAUL and JANE DOE MCNICHOL,
     and their marital community thereof;  ANDREW
20   and JANE DOE RUSSELL, and their marital
     community thereof;  HOWARD and JANE DOE
21   LIPSON, and their marital community thereof,
     PILOT GROUP, GP, LLC, a Delaware
22   corporation; and JANE and JOHN DOES 1
     through 8,
23
                                   Defendants.

NO. 2:17-cv-00920-JLR

**SECOND AMENDED
COMPLAINT**

/ / /

SECOND AMENDED COMPLAINT - 1
Case No. 2:17-cv-00920-JLR

1562026.05

RS   Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

Fulltime Fantasy Sports, LLC ("Fulltime") makes the following allegations on information and belief, except for those allegations involving Fulltime, which are made on the basis of personal knowledge:

## PARTIES

1.     Fulltime Fantasy Sports, LLC is a Delaware limited liability company.

2.     Defendant James Heckman was a member of Board of Directors and the Chief Executive Officer of Scout Media Holdings, Inc. ("Scout") at all times relevant to this lawsuit. To the extent Heckman and Jane Doe Heckman form a marital community, the acts of Heckman were done on behalf and in furtherance of their marital community.

3.     Defendant Paul McNichol was the Executive Vice President and a member of the Board of Directors of Scout during all times relevant to this lawsuit.  To the extent McNichol and Jane Doe McNichol form a marital community, the acts of McNichol were done on behalf and in furtherance of their marital community.

4.     Defendant Mark Stieglitz was the Chief Financial Officer of Scout from at least 2014 until mid-2015. To the extent Stieglitz and Jane Doe Stieglitz form a martial community, the acts of Stieglitz were done on behalf and in furtherance of their marital community.

5.     Defendant Doug Smith was the Chief Financial Officer of Scout beginning in mid-2015, following Defendant Stieglitz. To the extent Smith and Jane Doe Smith form a martial community, the acts of Smith were done on behalf and in furtherance of their marital community.

6.     Defendant Ross Levinsohn was a member and at times relevant hereto was the President of the Board of Directors of Scout and Scout's Executive Chairman (an officer position with operational responsibilities). To the extent Levinsohn and Jane Doe Levinsohn form a marital community, the acts of Levinsohn were done on behalf and in furtherance of their marital community.

7.     Defendant Craig Malitz was a member of the Board of Directors of Scout

RS   Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

beginning in 2015. To the extent Malitz and Jane Doe Malitz form a marital community, the acts of Malitz were done on behalf and in furtherance of their marital community.

8.    Defendant Ross Lukatsevitch was a member of the Board of Directors of Scout beginning in 2014 or earlier. To the extent Lukatsevitch and Jane Doe Lukatsevitch form a marital community, the acts of Lukatsevitch were done on behalf and in furtherance of their marital community.

9.    Defendant Tammer Fahmy was a member of the Board of Directors of Scout beginning in 2015. To the extent Fahmy and Jane Doe Fahmy form a marital community, the acts of Fahmy were done on behalf and in furtherance of their marital community.

10.    Defendant Joe Robinson was a member of the Board of Directors of Scout beginning in 2015. To the extent Robinson and Jane Doe Robinson form a marital community, the acts of Robinson were done on behalf and in furtherance of their marital community.

11.    Defendant Mayo Stuntz was a member of the Board of Directors of Scout beginning in 2014 or earlier until approximately the end of 2014 and was the Chairman of the Board of Directors prior to Levinsohn. To the extent Stuntz and Jane Doe Stuntz form a marital community, the acts of Stuntz were done on behalf and in furtherance of their marital community.

12.    Defendant Andrew Russell was a member of the Board of Directors of Scout beginning in 2014 or earlier until approximately the end of 2014.  To the extent Russell and Jane Doe Russell form a marital community, the acts of Russell were done on behalf and in furtherance of their marital community.

13.    Defendant Howard Lipson was a member of the Board of Directors of Scout beginning in 2014 or earlier.  To the extent Lipson and Jane Doe Lipson form a marital community, the acts of Lipson were done on behalf and in furtherance of their marital community.

14.    Jane and John Does 1 through 8 are officers, agents, and control persons of Scout

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

who haven't yet been determined or discovered (collectively, Smith, Stieglitz, Levinsohn, Malitz, Lukatsevitch, Fahmy, Robinson, Stuntz, Heckman, McNichol, Russell, Lipson, and Jane and John Does will be referred to as "Defendants").

## VENUE AND JURISDICTION

15.     Venue and jurisdiction over the parties and subject matter are proper in the King County Superior Court pursuant to RCW 2.08.010 and 4.12.025.  Venue and jurisdiction are proper in the U.S. District Court, Western District of Washington pursuant to 28 U.S.C. §1331. There are additional facts to those below that establish jurisdiction and venue is appropriate in this Court:

- Scout Media, Inc. (a wholly owned subsidiary of Scout Media Holdings, Inc. that employed Fulltime's owners after the APA, defined below) is a Washington corporation;

- Scout, for which all of the defendants were officers or directors, operated a Seattle office;

- Scout was originally founded in Seattle;

- The APA, as defined below, was executed by Fulltime in Seattle and the APA transaction was scheduled to close at Scout's counsel's offices in Seattle;

- Both Scout and Fulltime retained Seattle counsel to negotiate and draft the APA and related agreements;

- The Fulltime employees that became Scout employees as part of the APA were specifically identified as working in the Seattle office;

- The Fantasy Sports Division of Scout – for which the assets of Fulltime were transferred in the APA – were primarily used and managed out of the Seattle office;

- Many of the misrepresentations that are the subject of this lawsuit originated or were received in Seattle.

## FACTS

**A.  Certain defendants misrepresent Scout's financial health and stability to negotiate Scout's purchase of Fulltime, concealing Scout's financial crisis**

16.     Fulltime is a business that offers various products and services to fantasy sports

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

participants and enthusiasts. Fulltime facilitates dozens of fantasy sport leagues online and hosts in-person fantasy sports events that are attended by its thousands of members. Fulltime's primary fantasy event is the Fantasy Football World Championships which is an annual 5-day event in Las Vegas (the "Main Event").

17.     Scout is a now-bankrupt business that provided news and information to followers across the United States in a variety of different categories (sports, home, recreation). Scout was originally incorporated under the name North American Membership Group, Inc. ("NAMG"), and its name was changed to "Scout Media Holdings, Inc." in 2015.  For clarity, the name "Scout" is used throughout this complaint, even before the name change formally occurred.

18.     In spring of 2014, defendant Heckman approached Fulltime on behalf of Scout and proposed to begin negotiations regarding Scout acquiring Fulltime.  Scout did not have a significant presence in the Fantasy sports arena and acquiring Fulltime would immediately fill this void.

19.     Heckman proposed to structure the transaction so that the consideration provided to Fulltime was comprised entirely of equity in Scout, which would allow Scout's cash that otherwise would have been spent on acquiring Fulltime to instead be used to acquire other fantasy sports companies.  The acquiring of the other companies with Scout's cash would allow there to be more revenue under the Scout Fantasy umbrella.  Heckman suggested that Fulltime's principals, Ian Ritchie and Scott Atkins, could stay on as employees of Scout and be paid substantial bonuses that were upwards of $500,000 per year.

20.     In reality, the true reason that Heckman wanted to structure the deal as a stock exchange was to obtain an influx of cash from Fulltime without expending any cash, as detailed below. He knew that Scout did not have the cash to afford Fulltime or to pay the bonuses.

21.     In the course of negotiations from spring 2014 until December 2014, defendants Heckman and Stieglitz represented to Fulltime in multiple oral conversations that Scout was a

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

financially healthy business. They also told Fulltime that Scout had a valuation of between $150-200 million.

22.    Defendants Heckman and Stieglitz also represented to Fulltime that Scout was a stable company with a long-term strategy and ability to grow and diversify in the industry.

23.    In reliance on these representations, Scout and Fulltime entered into a Term Sheet in May 2014 under which the parties were required to negotiate in good faith towards a final agreement under which Scout would purchase Fulltime.  The parties agreed that they would value Scout's business and Fulltime's business to determine what percentage of Scout's equity would be provided to Fulltime in exchange for Fulltime's assets.

24.    To justify a valuation, defendant Heckman or Stieglitz provided Fulltime with a year-end 2013 consolidated financial statement for Scout.  The financial statement identified over $7.5 million in cash reserves.

25.    These financial statements revealed the importance of Scout's legacy magazine and continuity business, which was its major cash generator. The legacy magazine and continuity business involved sending products to customers on a set schedule and charging customers on pre-obtained credit cards or otherwise billing the customers for the delivered product.

26.    Based on the representations of Heckman and Stieglitz about Scout's financial health and stability, Fulltime began to integrate its operations into Scout's operations. Fulltime gave Scout control over its bank accounts and Paypal accounts, which contained about $900,000, and began branding itself as "Scout Fantasy."

27.    Relying on Heckman and Stieglitz's representations that Scout had cash to spend to acquire companies, Ritchie and Atkins set up multiple meetings with fantasy sports companies and high-profile individuals in the fantasy business to discuss them joining or being purchased by Scout.  Ritchie and Atkins communicated with Rotowire, Fantasy Pros, Pro Football Focus, Mathew Berry from ESPN, and Evan Silva from Rotoworld.

SECOND AMENDED COMPLAINT - 6
Case No. 2:17-cv-00920-JLR

1562026.05

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

28.     At or around the same time that Scout was representing itself to Fulltime as a financially healthy, stable business and negotiating toward a final agreement, Scout had actually decided to drastically change its business model and was experiencing an acute cash shortage.

29.     Scout's officers and directors, including defendants Stieglitz, Levinsohn, Lukatsevitch, Stuntz, Heckman, McNichol, Russell, and Lipson, made the decision to become a predominantly digital company, and therefore to (1) shut down Scout's legacy magazine business that had been responsible for the vast majority of Scout's historical revenue; and, (2) phase out its Minnesota Scout office and its Commerce Back Office ("CBO") operations that were responsible for all billing and client relationship management.

30.     Neither of these decisions, nor the disastrous impact of them, was disclosed to Fulltime.

31.     Scout's leadership recognized numerous red flags that Scout was prematurely executing on the vision to transition to a digital company. For example, in an email to Heckman, Stieglitz stated: "[J]ust scared to broadly cut in MN before we know CBO is working. [T]his is our revenue stream and if it breaks we don't know who we will need to fix it fast or patch until it is fixed."  Stieglitz's email was in response to Heckman appealing to Stieglitz to find more employees from the Minnesota office to terminate. Stieglitz reiterated his concerns more than once.

32.     Despite the warnings, Scout terminated the majority of its Minnesota employees in an effort to preserve its working capital and avoid a default with its lender, Multiplier Capital. Multiplier's loan to Scout contained a covenant that required Scout to maintain at least $1 million in cash reserves.

33.     The termination of the Minnesota employees resulted in a complete shutdown of the CBO system.  The shutting down of the CBO system was calamitous.  Once the system was shut down, Scout had no way to bill customers and more importantly no way to send products to its continuity customers.

RS   Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

34.     Defendant Stieglitz again sounded the alarm to defendant Heckman calling the billing situation a "disaster" and stating "right now we are unable to bill about $600K a week."

35.     The CBO failure and lost revenue pushed Scout to the brink of financial despair and of default of the covenants to its lender.  The near default was identified in an email string titled "NAMG Confidential" that circulated amongst Scout executives and disclosed that Scout had only $1.2 million in cash reserves by July 2014.

36.     In a July 11, 2014 email from defendant Heckman to Scout's Senior Vice President of Marketing, Freddie Laker, which copied defendant Stieglitz, Heckman admitted catastrophic financial problems at Scout:  **"Were you aware our sales dropped from 1.5MM in continuity to $23,000?...literally, we've lost $3MM in cash since May**[.]" (Emphasis in original).

37.     Scout never disclosed to Fulltime that its cash balances had dropped over $6 million in under half a year.  In fact, Scout was actively seeking to conceal its true financial position and cash situation from Fulltime.

38.     In an email from Heckman to Scout executives/employees, including Stieglitz, Heckman explained how he wanted information conveyed to potential investors and stated, "**I want nobody to understand our cash position.**"  He asked that investors such as Fulltime be told that he was out getting cash and that Scout had cash, despite neither being true.

39.     Heckman continued the ruse to Fulltime that Scout's cash situation was adequate, and in fact considerable.  Heckman even asked one of Fulltime's members, Ian Ritchie, to begin analyzing and meeting with other fantasy sports companies that Scout could acquire after it closed its transaction with Fulltime.  Heckman indicated that Scout was fully on-board with a strategy of acquiring additional fantasy sport events to advance Scout's position in the fantasy arena.  Ritchie met with multiple companies about acquisition while entirely in the dark that Scout was in a financial crisis and concerned about making payroll.

40.     While Scout was painting a rosy picture to Fulltime and had Fulltime believing

RS  Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

there was cash to spend, the infighting amongst Scout executives identified the real cash crisis and the fraud being perpetuated upon Fulltime. In an email from Laker to Heckman, Laker stated:

> Simultaneously we're trying to conserve cash and turning off all our existing offers because we don't want to or can't afford to pay for them.
>
> I have stressed multiple times that I would prefer to have had new initiatives in place before turning off our old reverse generating initiatives, but I've tried to support the company cash flow strategy.
>
> Combined this with pulling the plug in our billing platform and then being disabled for two months and we're not looking pretty.

41.     Laker recognized that Scout was misleading potential investors such as Fulltime when he directly stated to Heckman: "**We are not the Company that you're selling to people yet but we can by launch.**"

42.     Unbeknownst to Fulltime, Scout began using Fulltime's cash reserve to cover for its depleted cash situation. At the time Fulltime came under the Scout umbrella, it had approximately $900,000 in its bank and PayPal accounts. Much of this money was generated from entry fees that fantasy sports participants paid to Fulltime to play in its fantasy sports tournaments, including the Main Event.  An ever present issue was that these fantasy contests had guaranteed prizes that needed to be paid at the end of the contest, so for each dollar of revenue there was an associated liability that needed to be paid or set aside for future payment.

43.     Throughout the 2014 year as the cash crisis got tighter, Scout ignored these obligations and used Fulltime's cash and revenue as a slush fund to make payroll, pay vendors, and other expenses wholly unrelated to the fantasy business.

44.     As 2014 unfolded, Scout's position became more dire and it continued to conceal the truth from Fulltime, although the true situation was known to defendants Heckman and Stieglitz, and likely other defendants as well.

45.     Scout's dire cash situation just continued to get worse as on August 7, 2014 Stieglitz emailed Heckman stating:

RS   Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

> Here's the current look at cash and critical payables.  It shows we need the first million investment in the week of August 23 to stay above the Multiplier $1MM floor through August.

46.    Stieglitz continued to sound the alarm and in response to Heckman stated:

> If CBO was up today we would do that today with cash we have hoarded. But it isn't so I am hoarding cash in hopes I can pay the next payroll.

47.    The August 2014 cash crisis resulted in Scout failing to make required lease payments and the Minnesota landlord threatening default.

48.    The inability to bill customers because of CBO's failure lasted for over two months and resulted in millions of dollars in losses.

49.    An additional issue caused by the CBO failure and closing of much of the Minnesota operation is that Scout had in excess of $10M in product that was ready to ship that could not ship because of the broken CBO and client management system.  It is estimated by Scout employees that this resulted in another $7M in avoidable losses.

50.    With its revenue stream broken by the CBO issues, Scout's only avenue to significant cash was to obtain an outside infusion of capital.

51.    Because Scout had spent the entry fees for the 2014 Main Event on its operating expenses, it had to wait until additional revenues came in to pay the winners of the 2014 Main Event. Most of these revenues came in the form of investments that were solicited using the same misrepresentations and omissions that they used with Fulltime, as described in further detail below.

52.    Scout sought and obtained investments from multiple high net worth individuals in the latter portion of 2014.  Scout materially misrepresented its financials, value, revenue, cash position, and future potential to these potential investors, just as it did to Fulltime.  Based on these misrepresentations, Scout was able to obtain investment capital.

53.    Three of the high net worth individuals, Robert Hernreich and Ted and Joseph Serure, have filed a securities fraud lawsuit in the United States District Court for the Southern District of New York for the fraudulent statements and omissions that induced their investments



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

1  in Scout. *Hernreich v. Heckman*, Case No. 1:17-cv-06276.

2      54.    Another investor was the Malitz Investment Group, whose principals are

3  defendants Fahmy and Malitz. Fahmy and Malitz concede that Scout made material

4  misrepresentations in the soliciting of that investment and they would not have made the

5  investment had they known the true financial condition of Scout. However, soon after making

6  the investment, Malitz and Fahmy discovered the truth when Scout spent significantly more of

7  the Matlitz Investment Groups's money on existing debts than had been represented and agreed

8  to. Matlitz and Fahmy nonetheless remained on the Board of Directors and became complicit

   in the misrepresentations and omissions in an effort to protect their investment.

9      55.    Between beginning of negotiations regarding Scout's purchase of Fulltime and

10  December 2014, no one at Scout disclosed to Fulltime (1) the dire cash situation, (2) the

11  termination of the continuity and magazine businesses, (3) the significant decrease in revenue

12  and profits, (4) the decrease in the potential value of Scout, and (5) that but for the fraudulently

    obtained infusion of capital that Scout was teetering on the edge of bankruptcy.

13      56.    Scout's board of directors and certain officers during 2014, including defendants

14  Stieglitz, Levinsohn, Lukatsevitch, Stuntz, Heckman, McNichol, Russell, and Lipson, were

15  aware of and participated in the decision to end Scout's magazine and continuity business, the

16  failed CBO transition, the resulting cash crisis, and the attempt to solve that crisis through

17  outside investment. They also knew that these critical facts were not being disclosed to investors

    including Fulltime by Scout's officers.

18      57.    In December 2014, Scout and Fulltime finally signed an Asset Purchase

19  Agreement ("APA") in which Scout received certain assets of Fulltime in exchange for shares

20  of Scout stock.

21      58.    Fulltime's decision to continue allowing Scout to control its business prior to

22  the APA, and its ultimate execution of the APA, were made in reliance on the

23  misrepresentations and omissions set forth above, including that Scout was financially healthy

SECOND AMENDED COMPLAINT - 11
Case No. 2:17-cv-00920-JLR

1562026.05

**RS** Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

and stable.

59.     The purchase price under the APA was even calculated on the basis of misrepresentations and omissions about Scout's current condition. Scout and Fulltime agreed that Fulltime was valued at between $2,000,000 and $2,500,000 and that Fulltime should receive a commensurate amount of equity in Scout. Fulltime agreed to accept a certain number of Scout shares that were allegedly worth that amount in reliance on a valuation that used Scout's 2013 revenue numbers, which did not take into account the shuttering of the magazine and continuity business and the resulting cash crisis.

60.     Scout's board of directors and certain officers in 2014, including defendants Heckman, McNichol, Stieglitz, Levinsohn, Lukatsevitch, Stuntz, Russell, and Lipson, approved the purchase of Fulltime and the APA despite it being based on this fundamentally bogus valuation and despite the fact that Scout's true financial condition had never been revealed to Fulltime or its principals.

61.     Scout recognized that this was a securities transaction subject to both the state and federal securities laws in a board consent that was completed commensurate with this transaction.  The board consent directed Scout's attorneys to file a Notice of Exempt Offerings of Securities ("Form D") with the Securities and Exchange Commission.  A Form D was never filed related to this transaction.

**B.     Defendants continue to mislead Fulltime regarding when it would receive its shares of Scout stock, delaying Fulltime from discovering the fraud**

62.     During 2015 and into 2016, after execution of the APA, Fulltime repeatedly asked Defendants to transfer the shares of Scout so that Fulltime could receive the agreed-upon consideration.

63.     Defendants Heckman, Robinson, and Malitz falsely assured Fulltime that the transfer was imminent and that Fulltime's shareholders were listed on Scout's capitalization table. However, defendants never delivered the shares.

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

64.     When Fulltime continued to ask Defendants to transfer the shares, Defendants Heckman, Robinson, and Malitz said in conversations with Fulltime's principals that they would "make it right."

65.     These representations were false. Fulltime never received any Scout shares. Moreover, the defendants had solicited so many outside investments and Scout's prospects were so dim that the shares were essentially worthless, and Scout did not have cash to pay Fulltime or other investors. There was no way to "make it right."

66.     Fulltime relied on these misrepresentations and omissions by continuing to allow Fulltime to have control over its business assets, including its bank account, Paypal account, and its brand, during 2015 and 2016.

67.     A similar situation occurred with a company called Fanstar. Scout entered into a stock exchange agreement Fanstar under which Fanstar's key employees were promised employment and stock in Scout. Defendants never transferred stock to Fanstar.

68.     Scout also never paid the bonuses that Heckman had promised to Ritchie and Atkins during negotiations and that were required under Ritchie and Atkins' Employment Agreements they signed contemporaneously with the APA. That failure to pay wages is now the subject of a separate lawsuit filed by Atkins and Ritchie in King County Superior Court.

69.     Furthermore, Scout failed to pay multiple vendors for the 2014, 2015, and 2016 Main Events, damaging the reputation of Fulltime and its principals in the industry.

**C.  Fulltime discovers the fraud and spends substantial money to save the 2016 Main Event and mitigate its damages**

70.     In mid-2015, Scout's Board of Directors was investigating Heckman for his actions and had grown distrustful of him. While Heckman retained the CEO position, the Board reduced his control over Scout's finances and day-to-day business operations.

71.     Defendant Stieglitz also resigned as Chief Financial Officer by mid-2015, and the Board of Directors handpicked defendant Doug Smith to replace Stieglitz.  From this time

RS   Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224   |   Fax 206.583.0359

forward the Scout Board of Directors had access to and/or control over all of Scout's day-to-day financial operations.

72.     Thereafter, the Scout Board of Directors and the officers that it empowered had full control over all amounts that were generated by the Scout Fantasy business.  In 2016, Scout Fantasy generated between $1.8 million and $2 million in registration fees for its fantasy sports competitions (these amounts include contestants' winnings from the 2015 season that the contestants rolled over for entry into 2016 contests).

73.     The landscape in state regulation of fantasy sports contests also dramatically changed. There had been a few high profile fantasy sports competitions that had taken registration fees and held their competitions, but had spent the registration fees and were unable to pay amounts owed to their winners.  Consistent with the movement toward protecting fantasy participants' prize funds, many states considered a legislative solution to fantasy companies failing to pay winners.  New York (where Scout Holdings, Inc. and Scout Media, Inc. were headquartered until their bankruptcy and a state in which Scout Fantasy had numerous contestants for its competitions) passed regulations that required companies running fantasy contests to protect contestants' prize funds.

74.     The fantasy sport industry, including the Fantasy Sports Trade Association, was pushing fantasy companies to segregate prize funds as part of the entry fees to ensure that the funds were available to pay participants.  The movement in the industry was a recognition that the fantasy companies were holding the entry fees and prize fund in trust for the players, as anything else would be akin to a Ponzi scheme.

75.     Nonetheless, the unacceptable practice of spending the players' entry fees on general operating expenses and paying the prize fund from future revenues or entry fees occurred at Scout again for the 2015 Main Event.  Scout was late to pay many prize winners because it was waiting for the revenue to be available to pay.

76.     At the behest of Fulltime members Ritchie and Atkins, Scout recognized its

SECOND AMENDED COMPLAINT - 14
Case No. 2:17-cv-00920-JLR

RS  Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

obligation to protect the prize funds and in or around 2016 began placing registration fees in a prize fund account that segregated them from its general operating expenses.

77.     Unfortunately, Scout's continued financial woes led to a judgment creditor garnishing approximately $240,000 from the account.

78.     However, as more states were considering and passing legislation related to fantasy sports and segregation of prize funds, Scout continued to recognize the prize fund as an issue it must resolve.

79.     The Scout Board of Directors, led by Fahmy and Malitz, questioned Heckman and Smith about what the legal obligations were for Scout to segregate the prize funds in June 2016.   The officers and directors recognized that some duty existed but were seeking to understand the scope of that obligation.

80.     Heckman in an email to Fahmy and Malitz (cc'ing Smith) told the board that based on pending regulations in New York State that they only needed to segregate registration fees from New York State participants.   Heckman's analysis was nonsensical as segregating the entry fees from a limited number of New York State participants would do nothing to guarantee those participants were paid if they won a significant prize.

81.     Heckman's statements to the board relating to the prize fund were made nearly a year after the board had limited Heckman's powers because they did not trust him and while they were investigating him for actions that would ultimately lead to the board determining he should be terminated with cause.

82.     The New York statute required Scout to:

> Ensure authorized players' funds are protected upon deposit and segregated from the operating funds of such operator or registrant and otherwise protected from corporate insolvency, financial risk, or criminal or civil actions against such operator and registrant[.]

N.Y. Rac. Pari-Mut. Wag. & Breed. Law §1404(1)(l) (McKinney).

83.     The requirement of segregation applies to "operators," which is defined as "any person or entity that offers any interactive fantasy sports contest to any authorized player

RS   Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

through any interactive fantasy sports platform." N.Y. Rac. Pari-Mut. Wag. & Breed. Law §1401 (McKinney). Scout was an operator under this definition.

84.     Scout's officers and Board of Directors were aware of the New York law and its applicability to their fantasy business.

85.     They were also aware that they had an obligation to register as a fantasy sports "operator" under the law, but could not do so because they were nowhere near complying with the law's prize fund requirements.  Scout's financial situation had them in a position where they could neither comply with the law by registering nor comply with the law by having a fully funded prize fund.

86.     Despite the obligation to segregate and protect the contestants' prize funds, Scout continued to commingle the contestants' funds with its general operating account and spend the funds to pay its general obligations.

87.     The defendant directors and officers during 2016 (all defendants except for Defendants Stieglitz, Russell, McNichol, Lipson and Stuntz) knew at the time they were commingling and spending the contestants' funds that these acts violated the New York law, yet they persisted.

88.     By the end of August 2016, Scout was facing bankruptcy and the prize fund was significantly depleted.

89.     Scout Fantasy was scheduled to have the Main Event in Las Vegas, Nevada at the Tropicana Hotel from September 7 through 11, 2016.  Hundreds of fantasy contestants were travelling to Las Vegas for the event and had booked rooms at the Tropicana.  Thousands more were planning to draft their fantasy teams online during this period.

90.     Days before the event, one of Fulltime's principals, Ian Ritchie, learned that Scout had not and ultimately would not make a $70,000.00 payment to the Tropicana Hotel that was required prior to the event.  Ritchie then learned that the purportedly segregated prize fund account was lacking at least $920,000.00 that it was required to contain per the New York law.

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

91.     The event would be canceled if the $70,000.00 was not paid and Scout Fantasy would be in significant danger of administrative or civil action if the prize fund was not replenished with the $920,000.00.  If canceled, all of the fantasy contestants would demand immediate refunds totaling between $1,800,000 and $2,000,000—cash that Scout did not have. Fulltime would be forever tarnished as a fantasy business and would never again be able to attract customers to it content or its competitions.  Further, Ritchie and Atkins, who had both worked hard to build substantial goodwill and a strong reputation in the fantasy sports industry, would have their business and their reputation substantially tarnished.

92.     Faced with this dim prospect, Ritchie believed that it was necessary to mitigate damages. He demanded that Scout rescind the APA and return Fulltime to its members (who had never received any Scout equity anyway) so that Fulltime could remedy the situation.

93.     Ritchie made clear in emails and conversations with Scout representatives, individually and through counsel, before and after the rescission, that Scout was obligated to re-pay Fulltime for the amount Scout spent from the prize fund.

94.     On September 1, 2016, Scout agreed to a Rescission Agreement and rescinded the APA.

95.     Fulltime subsequently paid the $70,000.00 owed to the Tropicana and also replenished the prize fund with $921,000.00 so that it was in compliance with New York law. The 2016 Main Event was held as scheduled.

96.     Though Scout agreed to rescission of the APA, Fulltime has not been made whole. Fulltime has never received any compensation for the $991,000.00 that Fulltime had to spend to mitigate its damages and save the 2016 Main Event ($921,000.00 on the prize fund and $70,000.00 on the hotel), or the profits unjustly received from Fulltime's fantasy business between 2014 and 2016.

97.     Scout has now entered bankruptcy proceedings in Southern District of New York.

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

98. Before Scout's bankruptcy, its officers (defendants Heckman, McNichol, Stieglitz, Smith, and Levinsohn) drew salaries while they held those offices. All defendants were also shareholders in Scout, either individually or through their entities, such that they had personal interests in Scout's management of its affairs. By spending (or approving the spending) of the prize funds, the defendants were protecting their ownership interests in Scout and prioritizing them over the interests of the fantasy participants and Fulltime.

## FIRST CAUSE OF ACTION
### Primary Violation of Washington State Securities Act ("WSSA"), Chapter 21.20 RCW
### (Against Defendants Heckman, Stieglitz, Robinson, and Malitz)

99. Fulltime realleges and incorporates the foregoing paragraphs as if fully set forth herein.

100. Defendants Heckman, Stieglitz, Robinson, and Malitz are sellers of securities under WSSA because they substantially contributed to the sale of Scout shares to Fulltime.

101. Defendants Heckman and Stieglitz made material misrepresentations in the sale of securities by representing to Plaintiff that Scout was worth between $150 million and $180 million and that it was a stable company positioned for growth, in violation of RCW 21.20.010.

102. Defendants Heckman and Stieglitz further violated RCW 21.20.010 by omitting material facts in the sale of securities, including that (1) that Scout had lost over $6 million in cash from the 2013 financial statement that was provided; (2) that Scout was at times insolvent; (3) that Scout was in a perilous financial position; (4) that Scout was shutting down its magazine and continuity businesses; and, (5) that Scout's termination of its Minnesota employees had led to massive issues with its CBO operations, including an over 2-month period during which Scout could neither send product to nor bill customers.

103. Fulltime relied on these material misrepresentations and omissions when it agreed to accept shares of Scout in exchange for ownership of Fulltime. Fulltime agreed to the transaction because its principals believed Scout was financially stable, had adequate cash reserves, had a steady stream of income from its magazine and continuity business, and had a

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

long-term plan for growth. Even the number of Scout shares that Fulltime was supposed to receive under the APA was derived from the fraudulent valuation.

104.    After the APA was signed and the purchase of Scout stock was allegedly complete, Defendants Heckman, Robinson, and Malitz continued the fraud by materially misrepresenting to Fulltime that the transfer of Scout stock was imminent, that Fulltime's owners were listed on Scout's capitalization table, and that they would "make it right." These statements were false because the stock was never actually transferred and defendants knew that Scout's financial position was such that Fulltime could never receive stock with the value that had been promised.

105.    Fulltime relied on these misrepresentations in continuing to allow Scout to control its business assets and await the transfer of its Scout shares, all while Scout was improperly using Fulltime's cash and revenue to fund operations for its business.

106.    In addition to the primary violations set forth above of Heckman, Stieglitz, Robinson and Malitz, the above misrepresentations and omissions were made in those defendants' roles as officers and directors of Scout and therefore Scout, a non-party to this lawsuit, has violated RCW 21.20.010 and its primary violation may be the basis for secondary liability as set forth below.

107.    Although Fulltime has tendered its shares of Scout stock and otherwise sought rescission, it has not been made whole and has suffered consequential damages as a result of the material misrepresentations and omissions of Defendants Heckman, Stieglitz, Robinson, and Malitz, including but not limited to the monies spent to replenish the prize fund and hold the 2016 Main Event at the Tropicana Hotel, the damage suffered to its reputation in the industry due to Scout's mismanagement, and the profits that Scout unjustly received when it had possession of Fulltime's business assets.

108.    Fulltime is entitled to damages in an amount to be proven at trial, plus prejudgment interest of eight percent per annum, costs, and attorneys' fees. RCW 21.20.430(1).

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

## SECOND CAUSE OF ACTION
### Control Person Liability under WSSA
### (Against All Defendants)

109.   Fulltime realleges and incorporates the foregoing paragraphs as if fully set forth herein.

110.   Defendants Heckman, McNichol, Stieglitz, Levinsohn, Lukasevitch, Stuntz, Russell, and Lipson were officers, directors, and/or control persons of Scout under RCW 21.20.430(3) during 2014 at some or all times between the beginning of negotiations for Scout's purchase of Fulltime and execution of the APA.

111.   Defendants Heckman, McNichol, Stieglitz, Levinsohn, Lukasevitch, Stuntz, Russell, and Lipson were also control persons of Defendants Heckman and Stieglitz under RCW 21.20.430(3) during 2014 because they had authority to control their negotiations with Fulltime at some or all times between the beginning of negotiations for Scout's purchase of Fulltime and execution of the APA.

112.   Defendants Heckman, Levinsohn, Stieglitz, Levinsohn, Lukasevitch, Malitz, Fahmy, Robinson, and Smith were officers, directors, and/or control persons of Scout under RCW 21.20.430(3) during 2015 and 2016, when Defendants Heckman, Robinson, and Malitz misrepresented to Fulltime that its shares of Scout stock had been transferred or were going to be transferred.

113.   Defendants Heckman, Levinsohn, Stieglitz, Levinsohn, Lukasevitch, Malitz, Fahmy, Robinson, and Smith were also control persons of Defendants Heckman, Robinson, and Malitz under RCW 21.20.430(3) during 2015 and 2016, when Defendants Heckman, Robinson, and Malitz misrepresented to Fulltime that its shares of Scout stock had been transferred or were going to be transferred because they had the authority to control their statements to investors including Fulltime.

114.   By virtue of their status as officers, directors, and/or control persons under RCW 21.20.430(3), all defendants are jointly and severally liable for the primary violations of WSSA

SECOND AMENDED COMPLAINT - 20
Case No. 2:17-cv-00920-JLR



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

1562026.05

by Defendants Heckman, McNichol, Stieglitz, Malitz, Robinson, and non-party Scout set forth above.

### THIRD CAUSE OF ACTION
**Violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.)**
**("Exchange Act") and Rule 10b-5**
**(Against Defendants Heckman, Stieglitz, Robinson, and Malitz)**

115.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

116.    Defendants Heckman and Stieglitz made material misrepresentations in the sale of securities by representing to Plaintiff that Scout was worth between $150 million and $180 million and that it was a stable company positioned for growth, in violation of Section 10(b) and Rule 10b-5.

117.    Defendants Heckman and Stieglitz further violated Section 10(b) and Rule 10b-5 by omitting material facts in the sale of securities, including that (1) that Scout had lost over $6 million in cash from the 2013 financial statement that was provided; (2) that Scout was at times insolvent; (3) that Scout was in a perilous financial position; (4) that Scout was shutting down its magazine and continuity businesses; and, (5) that Scout's termination of its Minnesota employees had led to massive issues with its CBO operations, including an over 2-month period during which Scout could neither send product to nor bill customers.

118.    Defendants Heckman and Stieglitz knew these representations and omissions were false and misleading when they were made, or acted with reckless disregard for their falsity. Their scienter is evidenced by Heckman and Stieglitz's emails discussing the enormity of Scout's financial crisis and the intent not to let investors know, and an inference of scienter exists because as officers and directors, these defendants were making decisions about the core business issues, such as Scout's legacy magazine and continuity business, cash reserves, and outside investment, that were misrepresented or not disclosed.

119.    Fulltime relied on these material misrepresentations and omissions when it

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

agreed to accept shares of Scout in exchange for ownership of Fulltime. Fulltime agreed to the transaction because its principals believed Scout was financially stable, had adequate cash reserves, had a steady stream of income from its magazine and continuity business, and had a long-term plan for growth. Even the number of Scout shares that Fulltime was supposed to receive under the APA was derived from the fraudulent valuation.

120.    After the APA was signed and the purchase of Scout stock was allegedly complete, Defendants Heckman, Robinson, and Malitz continued the fraud by materially misrepresenting to Fulltime that the transfer of Scout stock was imminent, that Fulltime's owners were listed on Scout's capitalization table, and that they would "make it right." These statements were false because the stock was never actually transferred and defendants knew that Scout's financial position was such that Fulltime could never receive stock with the value that had been promised.

121.    Heckman, Robinson, and Malitz knew these statements were false or acted with reckless disregard to their falsity. Heckman's scienter is evidenced by the emails acknowledging the enormity of Scout's cash problem and admitting to try to hide it from investors. Malitz's and Robinson's scienter is evidenced by the fact that Heckman was under investigation by mid-2015, Stieglitz had resigned, and Malitz's admission that misrepresentations and omissions were made to him when he invested and that he discovered those misrepresentations and omissions shortly after joining the Board.  Malitz and Robinson were aware that there was no way when the statements were made to provide Fulltime with the benefit of its bargain because Scout's financial woes were such that it would be impossible for Fulltime to receive much of anything in value from Scout.

122.    Fulltime relied on these misrepresentations in continuing to allow Scout to control its business assets and await the transfer of its Scout shares, all while Scout was improperly using Fulltime's cash to fund operations for its business.

123.    The misrepresentations and omissions of Defendants Heckman, Stieglitz,

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

Robinson, and Malitz were made in their roles as officers and directors of Scout and therefore Scout, a non-party to this lawsuit, has violated Section 10(a) and Rule 10b-5 and this primary violation may be the basis for secondary liability as set forth below.

124.    Although Fulltime has tendered its shares of Scout stock and otherwise sought rescission, it has not been made whole and has suffered consequential damages as a result of the material misrepresentations and omissions of Defendants Heckman, Stieglitz, Robinson, and Malitz, including but not limited to the monies spent to replenish the prize fund and hold the 2016 Main Event at the Tropicana Hotel, the damage suffered to its reputation in the industry due to Scout's mismanagement, and the profits that Scout unjustly received when it had possession of Fulltime's business assets.

125.    Fulltime is entitled to damages in an amount to be proven at trial, plus prejudgment interest, costs, and attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Violation of Section 20(a) of the Exchange Act (15 U.S.C. §78t)**
**(Against All Defendants)**

126.    Fulltime realleges and incorporates the foregoing paragraphs as if fully set forth herein.

127.    Defendants Heckman, McNichol, Stieglitz, Levinsohn, Lukasevitch, Stuntz, Russell, and Lipson were control persons of Scout and of Defendants Heckman and Stieglitz during 2014 at some or all times between the beginning of negotiations regarding Scout's purchase of Fulltime and execution of the APA. These defendants were aware of, had the power to control, and actually did exercise control over decisions such as shutting down Scout's magazine and continuity business, how to handle Scout's depleted cash reserves, and solicitation of new investors such as Fulltime.

128.    Defendants Heckman, Levinsohn, Stieglitz, Levinsohn, Lukasevitch, Malitz, Fahmy, Robinson, and Smith were control persons of Scout and of Defendants Heckman, Robinson, and Malitz during 2015 and 2016, when Defendants Heckman, Robinson, and Malitz

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

misrepresented to Fulltime that its shares of Scout stock had been or would be transferred. These defendants were aware of and had the power to control Scout's disastrous financial state and communications between Scout and its representatives, on one hand, and investors in the company on the other.

129.   By virtue of their status as control persons, all defendants are jointly and severally liable for the primary violations of Section 10(b) and Rule 10b-5 by Defendants Heckman, Stieglitz, Malitz, Robinson, and non-party Scout set forth above.

### FIFTH CAUSE OF ACTION
#### Violation of the Washington Consumer Protection Act
#### (Against All Defendants)

130.   Fulltime realleges and incorporates the foregoing paragraphs as if fully set forth herein.

131.   The actions of Defendants Heckman and Stieglitz in soliciting investment into Scout without revealing its true financial condition, including the cash crisis it experienced in 2014, as detailed above, is an unfair or deceptive act or practice in the conduct of a trade or commerce, in violation of RCW 19.86.020.

132.   As corporate directors who participated in or knowingly approved of the conduct of defendants Heckman and Stieglitz during 2014, defendants Levinsohn, Lukatsevich, Stuntz, Russell, and Lipson are also subject to personal liability. *Grayson v. Nordic Const. Co., Inc.*, 92 Wn.2d 548, 554, 599 P.2d 1271 (1979).

133.   Defendants Heckman, Robinson, and Malitz committed further unfair and deceptive acts and practices in 2015 by materially misrepresenting to Fulltime that the transfer of Scout stock was imminent, that Fulltime's owners were listed on Scout's capitalization table, and that they would "make it right."

134.   As corporate directors who participated or knowingly approved of the conduct of defendants Heckman, Robinson, and Malitz during 2015, defendants Levinsohn, Lukatsevich, Fahmy, Robinson, and Smith are also subject to personal liability. *Grayson v.*



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

*Nordic Const. Co., Inc.*, 92 Wn.2d 548, 554, 599 P.2d 1271 (1979).

135.    This case affects the public interest because defendants injured other parties, including Robert Hernreich, Ted and Joseph Serure, the Malitz Investment Group, and Fanstar, in the same fashion as Plaintiff. *See Bavand v. OneWest Bank*, 196 Wn.App. 813, 385 P.3d 233 (2016). Defendants actively solicited these outside investments and had unequal bargaining power because of their exclusive access to information about what was really happening at Scout.

136.    The unfair and deceptive acts and practices of the Defendants set forth above caused injury to Fulltime in an amount not less than the $991,000 that Fulltime paid to save the 2016 fantasy football event and the amount of damage to the reputations of Fulltime and its principals.

137.    Fulltime is entitled to damages in an amount to be proven at trial, plus treble damages up to $25,000.00, interest, costs, and attorneys' fees. RCW 19.86.090.

### SIXTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against Defendants Heckman, Stieglitz, Robinson, and Malitz)

138.    Fulltime realleges and incorporates the foregoing paragraphs as if fully set forth herein.

139.    Defendants Heckman and Stieglitz supplied false information to Fulltime for the guidance of its business transactions by representing to Fulltime that Scout was worth between $150 million and $180 million and that it was a stable company positioned for growth.

140.    Defendants Heckman and Stieglitz also omitted material facts that, by their omission, made these defendants' statements about Scout, its financial health, and its business plan misleading. The material facts omitted include that: (1) Scout had lost over $6 million in cash from the 2013 financial statement that was provided; (2) Scout was at times insolvent; (3) Scout was in a perilous financial position; (4) Scout was shutting down its magazine and continuity businesses; and, (5) Scout's termination of its Minnesota employees had led to

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

massive issues with its CBO operations, including an over 2-month period during which Scout could neither send product to nor bill customers.

141.   Fulltime justifiably relied on these material misrepresentations and omissions when it agreed to accept shares of Scout in exchange for ownership of Fulltime. Fulltime agreed to the transaction because its principals believed Scout was financially stable, had adequate cash reserves, had a steady stream of income from its magazine and continuity business, and had a long-term plan for growth. Even the number of Scout shares that Fulltime was supposed to receive under the APA was derived from the fraudulent valuation.

142.   After the APA was signed and the purchase of Scout stock was allegedly complete, Defendants Heckman, Robinson, and Malitz supplied additional false information to Fulltime for the guidance of its business transactions by assuring Fulltime that the transfer of Scout stock was imminent, that Fulltime's owners were listed on Scout's capitalization table, and that they would "make it right," *i.e.*, make sure that Fulltime got the shares to which it was entitled. These statements were false because the stock was never actually transferred.

143.   The defendants listed above knew of Fulltime's reliance and sought to influence Fulltime because they wanted Fulltime to remain under Scout's control, allowing Scout to continue using its revenues to fund Scout's operations.

144.   As a direct and proximate result of the misrepresentations set forth herein, Fulltime has been damaged in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION
### Violation of the Uniform Fraudulent Transfer Act
### (Against Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn)

145.   Fulltime realleges and incorporates the foregoing paragraphs as if fully set forth herein.

146.   Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn were required to maintain and segregate fantasy contestants' prize funds from

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

Scout's general accounts under NY Statute § 1404(1)(l) and equitable principles of constructive trust.

147.   The contestants in the 2016 Main Event are creditors within the meaning of RCW 19.40.011 because they had a claim to the prize fund monies.

148.   Fulltime is equitably subrogated into the position of the 2016 Main Event contestants because it paid out all claims under the prize fund and has now stepped into the contestants' shoes for purposes of their claims against Scout.

149.   Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn knew the funds were required to be left untouched in the prize fund account, as evidenced by their earlier attempts to keep the prize fund segregated and by their conversations during summer of 2016 about the New York law's application to their business.

150.   Rather than honoring the limitations on the use of the funds, Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn, in their roles as officers and directors of Scout, fraudulently transferred the funds to themselves in the form of salaries (in the case of defendants Heckman, Smith, and Levinsohn) and used the funds to pay Scout's general business expenses in an effort to maintain value in Scout and obtain a return on their investments.

151.   Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn made the transfers with the intent to delay, hinder, or defraud the fantasy contestants.

152.   Defendants Heckman, Smith, and Levinsohn accepted the funds as transferees with knowledge of the facts and circumstances of the fraudulent transfer.

153.   Pursuant to RCW 19.40.071 and RCW 19.40.081(2)(a), Fulltime is entitled to judgment in an amount to be determined at trial that is no less than the $921,000.00 fraudulently transferred out of the prize fund by Defendants.

/ / /

/ / /

/ / /

1562026.05



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

**EIGHTH CAUSE OF ACTION**
**Conversion**
**(Against Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn)**

154.    Fulltime realleges and incorporates the foregoing paragraphs as if fully set forth herein.

155.    Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn were required to maintain and segregate fantasy contestants' prize funds from Scout's general accounts under NY Statute § 1404(1)(l) and equitable principles of constructive trust.

156.    Fulltime is equitably subrogated into the position of the fantasy contestants because it paid out all claims to contestants under the prize fund and has stepped into the contestants' shoes for purposes of their claims against Scout.

157.    Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn knew the funds were required to be left untouched in the prize fund account, as evidenced by their earlier attempts to keep the prize fund segregated and by their conversations during summer of 2016 about how the New York law applied to their business.

158.    Rather than honoring the limitations on the use of the funds, Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn, in their roles as officers and directors of Scout, wrongfully deprived the contestants of the prize funds by transferring the funds to themselves in the form of salaries (in the case of defendants Heckman, Smith, and Levinsohn) and using the funds to pay Scout's general business expenses in an effort to maintain value in Scout and obtain a return on their investments. In so transferring the funds, the aforementioned defendants willfully interfered with the contestants' right to possession of the funds.

159.    Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn are subject to personal liability for the funds converted to Scout's use because they were corporate officers who participated in and/or with knowledge approved of the conduct.

**RS** Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

160.    Defendants Heckman, Smith, Fahmy, Malitz, Lukasevitch, Robinson, and Levinsohn's unlawful conversion of the prize funds proximately and actually caused damages to Fulltime Fantasy in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against all Defendants as follows:

1.    Judgment, jointly and severally against the Defendants, in an amount to be proven at trial, as a result of the Defendants' violations of the Washington State Securities Act, Securities and Exchange Act of 1934, Washington Consumer Protection Act, Uniform Fraudulent Transfer Act, and common law torts of negligent misrepresentation and conversion;

2.    An award of treble damages under the Washington Consumer Protection Act;

3.    An award to Plaintiff for its costs, interest, and attorneys' fees to the full extent allowed by law, including RCW 21.20.430 and RCW 19.86.090; and

4.    Such other and further relief as the Court may deem just and equitable.

DATED this 24th day of October, 2017.


By _____
     Gulliver A. Swenson, WSBA #35974
     *Attorneys for Plaintiffs*
     RYAN, SWANSON & CLEVELAND, PLLC
     1201 Third Avenue, Suite 3400
     Seattle, Washington  98101-3034
     Telephone: (206) 464-4224
     Facsimile: (206) 583-0359
     swenson@ryanlaw.com



Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury under the laws of the State of Washington that on this 24th day of October, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Christopher B. Durbin, WSBA #41159
Jeffrey D. Lombard, WSBA #50260
COOLEY LLP
cdurbin@cooley.com
jlombard@cooley.com
*Counsel for Defendants Tammer Fahmy, Howard Lipson, Ross Lukasevitch, Craig Mallitz, Paul McNichol, Joe Robinson, Andrew Russell, and May Stuntz*

Brad Fisher, WSBA #19895
Davis Wright Tremaine LLP
bradfisher@dwt.com
*Counsel for James Heckman and Jane Doe Heckman*

Stellman Keehnel, WSBA #9309
Andrew R. Escobar, WSBA #42793
Jeffrey DeGroot, WSBA #46839
DLA Piper LLP (US)
Stellman.keehnel@dlapiper.com
Andrew.escobar@dlapiper.com
Jeffrey.degroot@dlapiper.com
*Counsel for Doug and Jane Doe Smith and Mark and Jane Doe Stieglitz*

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 24th day of October, 2017 at Seattle, Washington.

_A Henderson_
Angie Henderson, Legal Assistant

SECOND AMENDED COMPLAINT - 30
Case No. 2:17-cv-00920-JLR

1562026.05

RS   Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224  |  Fax 206.583.0359